THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| S.M., individually and on behalf of L.M., a Minor,<br><br>Plaintiff,<br><br>v.<br><br>UNITED HEALTHCARE OXFORD, and UNITED BEHAVIORAL HEALTH,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' [28] MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S [32] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00262-DBB-JCB<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] S.M., individually and on behalf of L.M. ("Plaintiff"), brings two claims against Defendant United Healthcare Oxford and United Behavioral Health (collectively "United") under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff argues that L.M. is entitled to coverage of his mental health care treatment at two residential treatment centers under his health insurance plan. For the reasons below, the court grants in part and denies in part the cross-motions.

---

[1] Plaintiff's Motion for Summary Judgment, ECF No. 32, filed October 27, 2023 [hereinafter Pl.'s MSJ]; Defendants' Motion for Summary Judgment, ECF No. 28, filed September 15, 2023 [hereinafter Defs.' MSJ].

**BACKGROUND**

**Plan Information**

This case centers on a group health benefits plan subject to ERISA (the "Plan").[2] S.M. was a participant in the Plan and his son, L.M., was a beneficiary.[3] Under the Plan, benefits are available for covered services, which are services that United has determined are medically necessary and appropriate.[4] A service is medically necessary if it is "provided by a recognized health care Provider" and determined to be "necessary for the . . . diagnosis or treatment of the condition," "[i]n accordance with generally accepted medical practice," "not for the convenience of the [person]," and "the most appropriate level of medical care the [person] needs."[5]

Covered services are provided at various levels of care. For patients requiring the most intensive care, hospital care is available.[6] For patients requiring the least intensive care, outpatient services are available.[7] For patients requiring more than what outpatient services offer but less than impatient care, intermediate levels of care are available.[8] At issue here are two forms of intermediate mental health services. The less intensive of the two is a Partial Hospitalization Program ("PHP"), which allows for at least 20 hours of service per week and is available to treat "members who are experiencing serious signs and symptoms that result in

---

[2] Compl. ¶ 4, ECF No. 2, filed April 14, 2022 ("The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. § 1001 . . . .").
[3] Compl. ¶ 1.
[4] Administrative Record 160, ECF No. 31, filed Sept. 16, 2023 [hereinafter R.].
[5] R. 310.
[6] R. 26.
[7] R. 18–19.
[8] R. 20–25, 251, 254.

significant personal distress and/or significant psychosocial and environmental issues."[9] The more intensive is Residential Treatment Center ("RTC") care, which provides "24-hour/7-day assessment . . . services, and . . . treatment to members who do not require the intensity of . . . care . . . offered in Inpatient."[10] United made behavioral health coverage determinations based on the Optum Level of Care Guidelines ("LOCG's" or "Guidelines").[11]

The LOCG's state that a member qualifies for inpatient mental health treatment if the member is an "imminent risk or current risk of harm to self, others, and/or property which cannot be safely, efficiently, and effectively managed in a less intensive level of care."[12] Conversely, to qualify for RTC or PHP care, a member must *not* be in an "imminent or current risk of harm to self, others, and/or property."[13]

For either inpatient or RTC care, the Guidelines require that "the factors leading to admission cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms."[14] The Guidelines provide examples of how the condition could be met. The first example is phrased identically under either RTC or inpatient care: "Acute impairment of behavior or cognition that interferes with activities of daily living (ADLs) to the extent that the welfare of the member or others is endangered."[15] The second example provided is phrased differently for inpatient treatment. The Guidelines state "Examples include . . . [p]sychosocial and environmental problems *that threaten*

---

[9] R. 22.
[10] R. 23.
[11] Optum Level of Care Guidelines, effective Feb. 2018, R. 15–28; Defs.' MSJ ¶ 14.
[12] R. 26.
[13] R. 24, 22.
[14] *Id.*
[15] R. 24, 26.

3

the member's safety or undermine engagement in a less intensive level of care."[16] For RTC

treatment, the Guidelines provide, "Examples include . . . [p]sychosocial and environmental

problems that *are likely to* threaten the member's safety or undermine engagement in a less

intensive level of care *without the intensity of services offered in this level of care*."[17]

 The Plan requires a "Pre-Admission Review" for all treatment rendered in an inpatient

facility.[18] The Summary Plan Description states that "all non-Emergency Hospital or other

Facility admissions must be reviewed by [United] before they occur. The Covered Person or the

Covered Person's Practitioner must notify [United] and request a pre-admission review. [United]

must receive the notice and request as soon as possible before the admission is scheduled to

occur."[19] Members are warned that "[i]f a Covered Person does not comply with these stay

review features, he or she will not be eligible for full benefits under this Policy."[20] If a member

fails to comply with the Pre-Admission Review procedures for non-emergency or substance

abuse disorder treatment, "[United] reduces what it pays for covered Facility charges by 50% if:

> (a) the Covered Person or his practitioner does not request a pre-admission review; or
> (b) the Covered Person or his or her practitioner does not request a pre-admission review as soon as reasonably possible before the admission is scheduled to occur; or
> (c) OHI's authorization becomes invalid and the Covered Person or his or her practitioner does not obtain a new one; or
> (d) OHI does not authorize the admission.[21]

---

[16] R. 26.

[17] *Id.* For hospital inpatient treatment, the wording of the latter example varies slightly. It states, "[e]xamples include . . . [p]sychosocial and environmental problems that threaten the member's safety or undermine engagement in a less intensive level of care." Rec. 26. Thus, the inpatient treatment example omits the phrases "are likely to" and "without the intensity of services offered in this level of care."

[18] R. 222, 311.

[19] R. 222, 311.

[20] R. 222, 311.

[21] R. 312.

4

The Plan also explains the process for obtaining reimbursement. A claimant must first send a written notice of claim to United "within 20 days of a loss."[22] United then sends a "proof of claim form" to the claimant.[23] If the claimant receives the proof of loss form within 15 days of [United] receiving the proof of claim, the proof of loss form "should be completed[] as instructed."[24] However, if the claimant does not receive the proof of loss form "within such time, the claimant may provide written proof of claim to [United] on any reasonable form."[25] "If a notice or proof is sent later than 90 days of the loss, [United] will not deny or reduce a claim if the notice or proof was sent as soon as possible."[26] "No action at law or in equity shall be brought to recover on the Policy until 60 days after a Covered Person filed a written proof of loss."[27] The policy states:

> For reimbursement for your Covered Service, you must complete a claim form, sign it, and send it to Us with the original, itemized bill(s). Only original bills will be considered. Itemized bills should contain:
>
> - Patient Name
> - Type of service
> - Name and address of provider making the charge
> - CPT-4 codes or HCPCS codes (description of services)
> - Date of service
> - Individual charge for each service
> - ICD-9 codes (diagnosis or symptoms) . . .
>
> Claim forms are available from the Group or from Us . . . . Send Us written proof covering the occurrence, character and extent of the loss for which claim is made. You must meet the time requirements for other proofs of loss, as described in this section.[28]

---

[22] R. 247.
[23] R. 247.
[24] R. 247.
[25] R. 247.
[26] R. 247.
[27] R. 246.
[28] R. 309.

If a member disagrees with an initial benefits decision, the member may request an appeal review of the initial decision.[29] The review will either affirm or reverse the initial benefits decision. If the member disagrees with the first-level appeals decision, the member can request a second-level appeals decision.[30] If United's denial is based on a medical necessity determination, an external review process is available.[31] Under New Jersey law and under the Plan, an external review is available if the "Health Plan denied, limited, or delayed a covered treatment . . . or service because the Health Plan determines it is not medically necessary or is experimental or investigational."[32]

### Medical History

L.M. has faced significant challenges. From an early age, L.M. had difficulties with getting along with others.[33] His parents identify two sources of significant trauma during his childhood. They believe that "one of [L.M.]'s caregivers would shake and hit him when she believed no one was watching."[34] Further, his half-sibling, T.M. sexually abused L.M. for several months when he was seven years old.[35] After reporting his abuse to a family member, T.M. was sent to a wilderness program and then to a therapeutic boarding school.[36] L.M. also

---

[29] R. 264 (Utilization Review first-level appeal process); R. 267 (benefit, network, and administrative issues appeal process for first-level appeals).
[30] R. 265–266 (Utilization Review second-level appeal process); R. 268–69 (benefit, network, and administrative issues appeals process for second-level appeals).
[31] R. 266.
[32] R. 3098.
[33] R. 615. His parents noted that L.M. frequently played by himself instead of engaging with others. R. 615. He also behaved aggressively towards his peers at summer camp and was asked to leave multiple times. R. 615.
[34] R. 615.
[35] R. 615.
[36] R. 615.

faced other challenges at home. His father struggled with alcohol addiction.[37] According to L.M.'s mother, his father had been physically abusive since he was eight years old.[38] L.M.'s father hit him "open-handed and back-handed along with kicks on the ground."[39] She described life at home as being "heavy," and the kids at home frequently "retreated to their rooms to avoid confrontation or ridicule."[40]

As life at home became increasingly volatile, so too did L.M.'s behavior. His school asked L.M. to "leave his 7th grade year as a result of multiple incidents of violence to other students[.]"[41] In one such incident, L.M. gave another student two black eyes.[42] His behavior also worsened at home. During the fall of 2018, L.M.'s mother determined that she and her children "were no longer in a safe and predictable environment" and obtained a court-ordered restraining order against L.M.'s father.[43] L.M. and his mother temporarily lived at his aunt and uncle's home, who soon asked them to leave due to L.M's violent behavior.[44] Soon, L.M.'s aggression became directed at his mother.[45] During one episode, he punched his mother in the face.[46] His father noted that L.M. "consistently refused to abide by family boundaries and rules under his mother's supervision" and he "routinely got calls from [L.M.'s] mother and other caregivers that [he] was unmanageable."[47] L.M. was admitted to Houston Behavioral Hospital in

---

[37] R. 1716, 1723.
[38] R. 1697.
[39] R. 1697.
[40] R. 1716.
[41] R. 615.
[42] R. 615.
[43] R. 1697.
[44] R. 615.
[45] R. 615.
[46] R. 615.
[47] R. 615.

November 2018 to receive residential care for several weeks.[48] After the inpatient treatment,

L.M. received intensive outpatient treatment for several weeks.[49] His mother reported that

insurance denied the last ten days of L.M.'s IOP treatment because "they felt that he was not

participating."[50] L.M.'s mother reported that the director of the program recommended

wilderness treatment going forward.[51]

*Treatment at SUWS of the Carolinas*

L.M. was admitted to SUWS of the Carolinas ("SUWS"), a wilderness program, on

December 28, 2018.[52] Weekly reports at SUWS evaluating L.M.'s level of participation, mood,

and "affect" indicate that he was often "agitated" and "reactive" while receiving treatment.[53] In

March 2019, L.M. "intentionally waited for an opportunity to hit a specific staff [member]" and

once the opportunity arrived, he hit the individual.[54] His mother reported that the staff member

was hit in the face and got a black eye.[55] In another incident in early April 2019, L.M.'s mom

reported that a staff member told L.M. that his behavior would prevent him from being admitted

to a boarding school.[56] In response, L.M. walked off and banged his head into a van window,

breaking the glass and cutting his head, requiring several stitches.[57] L.M.'s therapist also

---

[48] R. 615.
[49] R. 1704.
[50] R. 1717.
[51] R. 1704.
[52] R. 615.
[53] January 21, 2019 Weekly Report, R. 676; February 4, 2019 Weekly Report, R. 680; February 11, 2019 Weekly Report, R. 681; February 18, 2019 Weekly Report, R. 682; February 25, 2019 Weekly Report, R. 683; March 4, 2019 Weekly Report, R. 684; March 11, 2019 Weekly Report, R. 685; March 25, 2019 Weekly Report, R. 687; April 1, 2019 Weekly Report, R. 688.
[54] R. 615, 1901, 729.
[55] R. 615.
[56] R. 615, 1722.
[57] R. 615, 1722.

reported that SUWS staff had to "engage[] in a physical restraint . . . several times . . . which typically leads to [L.M.] being physically reactive and aggressive."[58] SUWS' discharge summary report noted L.M. "tested the boundaries at times throughout his stay; however as time progressed he seemed to better understand his acting out patterns and bec[a]me increasingly accepting of the boundaries."[59] He also "was able to better contain his behavior [and] began to show leadership."[60] L.M. was discharged on April 14, 2019.[61]

      After discharge, SUWS provided L.M.'s parents with a "Clinical Services Breakdown" statement,[62] which SUWS described as "an itemized receipt to clients at the end of their stay" that " breaks down the cost of the program day by day and includes the dates of services as well as codes used for the processing of insurance claims."[63] On July 20, 2019, Plaintiff submitted the Clinical Services Breakdown[64] and a claim form to obtain reimbursement for professional services ("Professional Claim") to United.[65]

      In August 2019, United issued Explanation of Benefits ("EOB") statements, explaining that "further information from your provider [is needed] before we can process this claim" for Professional Services.[66] United requested that Plaintiffs submit documentation regarding "Diagnosis, Functional status, treatment plan/goals, Symptoms, Prognosis, [and] Progress to

---

[58] CALO Initial Treatment Plan, Rec. 1704 (CALO therapist describing information received from L.M.'s therapist at SUWS).
[59] R. 357.
[60] R. 357.
[61] R. 662.
[62] R. 131–134.
[63] R. 134.
[64] R. 131–134.
[65] R. 130, R. 2067 (Plaintiff's appeal letter explaining that "Upon L.M.'s discharge from SUWS, I submitted a member claim including the original itemized statement from SUWS to United[.]").
[66] R. 496.

date."[67] United also explained that a number of claims "could not be processed as the date of service[s] are missing."[68] United sent a similar notice, a Provider Remittance Advice ("PRA") statement, directly to SUWS.[69] The PRA provided SUWS with identical instructions as those contained in the EOB.[70]

After realizing that SUWS provided "both inaccurate and incomplete information" in the statements sent to United, S.M. took "significant time and effort" in correcting the SUWS billing statements.[71] In January 2020, S.M. submitted a corrected invoice to United.[72] On January 20, 2020, S.M. received an EOB from United, which listed the Professional Services claims as "denied because the claim was not sent to us on time."[73]

*SUWS Appeal*

On June 19, 2020, Plaintiff appealed United's decision to deny reimbursement for services at SUWS.[74] The appeal challenged United's adverse decisions regarding Professional Services and a claim for facility charges. Plaintiff argued that once he realized that the SUWS invoice was both inaccurate and incomplete, "[i]t took significant time and effort to obtain an official statement."[75] He asserted that he was not able to submit the corrected statements until January 2020, which was done "as soon as reasonably possible."[76] United responded on July 10, 2020, explaining that coverage was not available for treatment at SUWS because it had

---

[67] R. 496.
[68] R. 496.
[69] R. 3169–176, 3195–202.
[70] *See* R. 496 *and* R. 3170–71.
[71] R. 2068.
[72] R. 2068.
[73] R. 2077.
[74] R. 2067.
[75] R. 2068
[76] R. 2068.

10

"determined that its wilderness therapy program to be an experimental or unproven treatment. It is not covered under her [sic] health plan benefit."[77] This response said nothing about belated submission or a lack of documentation. S.M. appealed the decision to an external agency on October 20, 2020, arguing that SUWS was not providing experimental or unproven treatment to L.M.[78] The parties agree that the request for an external review was requested "as is allowed under the terms of the plan."[79] On February 4, 2021, United informed L.M. that the external review organization ("ERO") overturned the previous decision and that it would "reprocess the claim(s) from the SUWS of the Carolinas" for the relevant dates of service.[80] The external review determined that the SUWS wilderness therapy program on the dates of service December 28, 2019 through April 14, 2019 "was not experimental/investigational for this enrollee, and as such, was medically necessary for treatment of the enrollee's condition."[81] Further, it states that "we are recommending that the determination of Oxford Health Plans of NJ, Inc., be overturned. Please be advised that this determination is binding on the carrier and covered person . . . ."[82]

After the external review, United informed Plaintiffs that it was "unable to process this claim due to missing information."[83] United also sent two analogous PRA statements to SUWS, once on February 17, 2021 (days after the external review decision), and again on April 30, 2021.[84] However, United determined that it had sufficient information for the facility charges.

---

[77] R. 3090.
[78] R. 3037.
[79] Defs.' Statement of Facts ¶ 35, Defs.' MSJ 10.
[80] R. 3249.
[81] R. 10.
[82] R. 11.
[83] R. 485.
[84] R. 3177–3186 (Feb. 17, 2021 PRA), R. 3187–3194 (April 30, 2021 PRA).

On May 14, 2021, United reprocessed the reimbursement claim for the facility charges, allowing $2,037 to apply toward Plaintiff's deductible.[85]

*Treatment at CALO*

On April 15, 2019, the day after L.M. was discharged from SUWS, he was admitted to Change Academy Lake of the Ozarks ("CALO"), a residential treatment facility.[86] His initial Suicide Risk Assessment noted that L.M. did not have any suicidal ideation but had thoughts of wanting to harm himself and others within the past year.[87] During the first month of treatment, L.M. punched a peer in the face after the peer jokingly punched L.M in the arm.[88] From April until July 2019, CALO staff reported that L.M. had frequent issues with yelling, teasing, bullying, and "posturing."[89]

On July 8, 2019, a staff member reported that "upon learning that [L.M.] may be transferring to the teen building . . . [L.M.] has become less tolerant and more irritable with his current peers."[90] On July 11, 2019, staff reported that L.M. displayed physical aggression through "pushing/shoving, punching walls/objects, and throwing things."[91] On July 21, 2019, L.M. punched a peer in the stomach after a disagreement about which movie to watch.[92] The July 26, 2019 progress report states that L.M. displayed physical aggression through kicking.[93] Sometime around August 22, 2019, L.M. transferred to the teen group.[94]

---

[85] R. 399–406.
[86] R. 1704.
[87] R. 1706.
[88] R. 1649.
[89] R. 1337–1628.
[90] R. 1252.
[91] R. 1318.
[92] R. 1285.
[93] R. 1267.
[94] R. 1145.

Staff reported on September 11, 2019, that L.M. punched a peer in the stomach and then shoved him into a sink.[95] L.M. "quickly walked away and acted as if he had not done anything."[96] On September 26, 2019, L.M.'s father told CALO that he and L.M.'s mother decided that they were planning on transitioning L.M. home in November or December.[97] A clinician told his parents that there were concerns about the "academic impact" of leaving CALO, that "trauma work . . . needs to be done," and "neuro sessions [were] just starting."[98] L.M. transitioned home on December 18, 2019.[99]

*First Initial Adverse Decision for CALO Reimbursement and First Level One Appeal*

On September 17, 2019, United denied L.M.'s claims for his treatment at CALO from April 15, 2019 through June 30, 2019 because "[y]our care could have continued in the Partial Hospitalization Program Setting with therapy and medication management."[100] On September 27, 2019, United denied L.M.'s claims for service at CALO from July 15, 2019 through July 31, 2019.[101] The September 27, 2019 letter states that L.M. was "admitted for treatment of your Mood disorder. Your behavior was in control throughout the period. You were engaged in your recovery. You did not need the 24 hour monitoring provided in a Residential Setting."[102] United's denial letters did not address the dates of service from July 1 through July 14, 2019.

---

[95] R. 1042.
[96] R. 1042.
[97] R. 989.
[98] R. 966.
[99] R. 741, 752.
[100] R. 634.
[101] R. 638.
[102] R. 638.

On March 6, 2020, Plaintiff requested a level one appeal for the dates of service "from April 1, 2019 through December 18, 2019" for L.M.'s treatment at CALO.[103] L.M.'s letter argued that his treatment was medically necessary due "his history of aggression, and dysregulation, and his history of failing out of lower levels of care."[104] L.M provided letters from Dr. Alain Katic,[105] who had treated L.M. "since December 2013;"[106] Erica Thiessen, L.M.'s therapist at SUWS;[107] and Kaithey Abeln,[108] the clinical director of the pre-teen program at CALO. These letters recommended that L.M. continue receiving residential therapy treatment.[109] The appeal also included a neuropsychological evaluation from Dr. Mary Crowson, who determined that L.M. would receive the greatest benefit from a "specialized boarding school" due to "his history of . . . limited success with outpatient psychotherapy."[110]

On April 30, 2020, United responded to Plaintiff's request for a level one appeal.[111] United upheld the initial adverse decision, stating that the "non coverage determination will be upheld [from] 4/15/2019 and forward."[112] United explained that the decision was based on the

---

[103] R. 604–2060.
[104] R. 625.
[105] R. 693.
[106] R. 693.
[107] R. 691.
[108] R. 695–96.
[109] R. 693. (Dr. Katic concluding "[i]t is my medical opinion that without such intensive treatment, as provided at these two programs, [(referring to "residential/boarding programs")] [L.M.] would have remained at ongoing risk of potential self-injurious behavior or at risk of harming others."); R. 691 (Ms. Thiessen, LPCS, "recommend[ing] that [L.M.] continue in a therapeutic, residential treatment program that can appropriately address his personal safety, emotional regulation, and behavior management needs while supporting academic and developmental growth."); R. 696 (Ms. Abeln, M.A., LPC, determining that "L.M. needs round the clock, constant supervision that can only be provided in a residential environment.").
[110] R. 715.
[111] R. 80.
[112] R. 80.

"Mental Health Residential and the Optum Common Criteria and Clinical Best Practices"

Guidelines.[113] The letter states:

> Your son's clinical information was reviewed. It was noted that he was sent to
> this therapeutic boarding school to work on long term issues such as low
> confidence and decreased frustration tolerance. He was calm. He was engaged in
> care. He was needing to engage more in family therapy while practicing skills in
> his home environment with his primary supports. His mood was stable. He was
> not wanting to harm himself or others. It seems that his care could have continued
> in the partial hospitalization setting.
>
> . . .
>
> This is the Final Adverse Determination of your internal appeal. All internal appeals
> . . . have been exhausted. [114]

*Second Initial Adverse Decision for CALO Reimbursement and Second Level One Appeal*

On April 26, 2020, United provided an initial benefits decision regarding the dates of

service November 1, 2019 through December 18, 2019.[115] The letter states that the reviewer's

decision to uphold the initial adverse decision was based on the "Mental Health Residential

Treatment" Guideline.[116] It states:

> Your child was admitted for intensive treatment of his behavioral dysregulation.
> For dates of service 11/01/2019 through 12/18/2019, his behavior was in better
> control and he was more engaged in recovery. He was medically stable. He did
> not need the 24 hour monitoring provided in a Residential setting.[117]

Plaintiff submitted a second level one appeal on June 19, 2020, offering the same

arguments as those made in the first level one request and expressing confusion about receiving

---

[113] R. 80.
[114] R. 80.
[115] R. 3052.
[116] R. 3052.
[117] R. 3052.

15

an initial benefits determination rather than a "level one member appeal" for the November 1

through December 18, 2019 dates of service.[118]

United responded to the second level one appeal on July 4, 2020, upholding its denial.[119]

The decision was based on the LOCG "for the Mental Health Residential Treatment Center

Level of Care."[120] The letter explains:

> Your child was in continuing treatment for mood and behavioral issues,
> unmanageability, physical aggression towards others, and some self injurious
> behavior. He had started care for these issues in late December 2018 in an outdoor
> behavioral health program and then entered this program in April 2019. He had
> been in treatment there through late October 2019, then continued on in
> November 2019 through December 18, 2019. Your child was generally
> cooperative, typically responsive to staff, medication adherent, and had made
> preceding treatment gains. He presented no serious ongoing acute behavioral
> management challenges. Your child had no suicidal or self harm thinking; no self
> harmful behaviors were reported. Your child posed no overall risk of harm to
> others – he was not homicidal, combative, or assaultive. A few instances of noted
> aggressive or inappropriate behavior did not require ongoing 24 hour residential
> care. His thinking made sense. He had no bizarre beliefs and was not
> hallucinating. His mood was more stable overall, even if somewhat dysphoric at
> times. He had developed and was using coping skills. Self care was adequate.
> There were no active medical problems needing treatment in this setting.
> Medication was helpful. You were supporting and involved. Family work was
> progressing. Given his condition, your child did not need continuing care in a
> monitored 24 hour treatment setting. Care could have continued in a less
> restrictive setting. Your child could have continued care in the Mental Health
> Partial Hospitalization Program setting.[121]
>
> . . .
>
> This is the Final Adverse Determination of your internal appeal. All internal appeals
> . . . have been exhausted. [122]

---

[118] R. 2119, Pl.'s MSJ ¶ 49 ("Plaintiff appealed again . . . , reiterating the same arguments [as those raised in the first level one appeal].").
[119] R. 89.
[120] R. 89.
[121] R. 89–90.
[122] R. 80.

Plaintiff filed the Complaint on April 14, 2022, asserting two causes of action: a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) ("ERISA") and a claim for violation of the Mental Health Parity and Addiction Equity Act ("MHPAEA").[123] The parties each filed and fully briefed Motions for Summary Judgment, including a notice of supplemental authority and a response to same.

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[124] "Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[125] Moreover, "[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[126]

## DISCUSSION

### I.   ERISA

Under 29 U.S.C. § 1132(a)(1)(b), a civil action may be brought by an insurance plan participant to recover benefits under the terms of the plan. The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless

---

[123] Compl., ECF No. 2.
[124] Fed. R. Civ. P. 56(a).
[125] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up).
[126] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[127]

The parties agree that de novo review is appropriate here, so the court reviews United's denial of benefits accordingly.[128] Under the standard, "the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness."[129] Indeed, "the standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review [of the administrator's decision]."[130]

### A.   Coverage for Treatment at SUWS

Plaintiff argues that the external review organization's determination is binding on United, thus requiring United to reimburse Plaintiff for treatment at SUWS from December 28, 2019 through April 14, 2019.[131] United argues that the external review only required United to "reprocess" the claim for payment, not reimburse Plaintiff outright.[132] Because Plaintiff failed to

---

[127] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Foster v. PPG, Inc.*, 683 F.3d 1223, 1231 (10th Cir. 2012).

[128] "The Plaintiff's Plan was issued in Texas, and Texas law prohibits discretionary clauses. Tex. Ins. Code § 1701.062. Thus, there is no dispute that the de novo standard applies here . . . ." Defs.' Mot. in Resp. to MSJ 29, ECF No. 43, filed Oct. 27, 2023 [hereinafter Defs.' Resp.]. Plaintiff originally argued that the arbitrary and capricious standard applied, but later agreed with Defendants that the de novo standard governs. Pl.'s Opp. to Defs.' MSJ 3, ECF No. 46, filed October 27, 2023 [hereinafter Pl.'s Resp.] ("Because United has conceded the standard of review, the court should review both of Plaintiff's causes of action de novo.").

[129] *Niles v. American Airlines, Inc.*, 269 F.App'x. 827, 832 (10th Cir 2008) (unpublished); *Firestone Tire*, 489 U.S. at 956 ("Consistent with established principles of trust law, we hold that *a denial of benefits* challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard . . . ." (emphasis added)).

[130] *Niles*, 269 F.App'x. at 833.

[131] Pl.'s MSJ 25.

[132] Defs.' MSJ 27.

provide the information required to submit a claim as defined by the Plan, United contends that Plaintiff has failed to meet his burden of demonstrating entitlement to Plan benefits.[133]

United first explained that Plaintiff's claim lacked requisite information in a series of EOBs in August of 2019. The dates of service with the adjustment code "D60N1" required L.W.'s provider to send information regarding "Diagnosis, Functional status, treatment plan/goals, Symptoms, Prognosis, Progress to date, Start and Stop times (if applicable), medication monitoring (if applicable), modalities and frequencies of treatment furnished, and clinical test results (if applicable)."[134] The dates of service with the adjustment code "TDEN" "could not be processed as the date of service(s) is missing. Your provider must resubmit the claim with the date of service information."[135] The EOB also explains that "[a] claim is any request by a covered Member for certification of a benefit, or payment for a service, as required under the terms of the Member's health plan. A claim is denied when it does not meet the criteria established by our plan."[136] Plaintiff then supplemented the inadequate SUWS statement by providing a corrected statement to United.[137]

United received the corrected statement in January 2020,[138] well beyond the 45-day deadline set by the EOB's.[139] United delivered a new EOB on January 15, explaining that the claim was denied for failure to send the information on time.[140] The EOB also explained that

---

[133] Defs.' MSJ 27.
[134] R. 496.
[135] R. 496.
[136] R. 497.
[137] R. 2068.
[138] R. 2068.
[139] R. 467, 496.
[140] R. 2077.

Plaintiff had the right to request a review of the denial, which Plaintiff chose to do June 19, 2020.[141] Other than the corrected SUWS statement, it is not clear whether S.M. included additional SUWS records in the request for appeal. However, United did receive them because United delivered additional SUWS records to the ERO.[142]

The Plan document governs the court's de novo review of United's benefits determination. In doing so, the record must establish that the Plaintiff is entitled "to recover benefits . . . under the terms of his plan."[143] The Plan states that "[i]f all or part of the [E]RO's decision is in favor of you, We shall promptly provide coverage, including payment on the claim for the health care services found by the [E]RO to be Medically Necessary Covered Services."[144] Thus, because the ERO provided a favorable decision regarding the SUWS claim, payment is required by the Plan.

The administrative record further confirms Plaintiff's entitlement to payment. Regarding the claims with the adjustment code "D13," the post-external-review EOBs do not clearly describe what information is missing.[145] They only state that "[a]ll claims must include an itemized bill of services rendered, medical diagnosis code(s), procedural code(s), place of service and other pertinent clinical information."[146] The court finds that this information is contained in the administrative record. The corrected statement lists the dates of service, the place of service,

---

[141] R. 2066.
[142] R. 5–8. Review of the corrected SUWS statement indicates that the document did not contain all of the information United requested in the August 2019 EOB's. The corrected statement provides the dates of service, insurance information, and various diagnosis and treatment codes; but it does not contain any treatment plans, prognosis, progress, or symptom information. *See* R. 2100–2107. Regardless, such clinical notes are in the administrative record and are subject to de novo review.
[143] 29 U.S.C. § 1132(a)(1)(B).
[144] R. 267.
[145] R. 485, 519.
[146] R. 485, 519.

and the diagnosis code ("DX").[147] The original SUWS document lists the procedural codes.[148] Regarding the dates of service with the adjustment code "TDEN," the post-external-review EOB's state that "[t]his claim could not be processed as the date of service(s) is missing. Your provider must resubmit the claim with the date of service information."[149] However, as explained, the corrected statement provided the dates of service for each claim. In short, L.M sufficiently provided the requested information.

United argues that its post-external-review requests for information are not reviewable by the court because they are not denials under the Plan.[150] This contention, even if it were true,[151] does not negate United's failure to raise its procedural objection to Plaintiff's claim in its level-one appeal decision. It is noted that a claimant who fails to timely submit requested information must follow the internal appeals process before filing suit under ERISA. It would make little sense for Plaintiff to be forced back into the internal appeals procedure regarding an insufficient statement when Plaintiff sought review over the same issue in his first request for an appeal more than four years ago. Plaintiff exhausted the appeals procedure by successfully requesting an external review, and United waived its right to revive the same procedural objections after the ERO's decision. L.M. is entitled to benefits for his $19,170 claim regarding treatment at SUWS.[152] However, because neither party identified how much, if any, deductible is remaining,

---

[147] R. 2100–2107.
[148] R. 131–133.
[149] R. 485, 519.
[150] Defs.' Reply 13.
[151] The EOBs explain that "failure to submit this [requested] information within 45 days will result in an automatic denial of this claim due to lack of information. No further notice will be provided to you. In the event you fail to follow these procedures in the timeframe specified, but wish to submit relevant information outside the timeframe and/or request an appeal, please follow the appeal procedures outlined below." R. 486. Because more than 45 days have passed, the EOB's constitute denials of benefits and not just requests for information.
[152] R. 3249.

whether there is applicable coinsurance, or any other aspect of how the ultimate payment on the claim is calculated, the court remands the claim to United for said calculation and payment.

### B.    Coverage for Treatment at CALO

Plaintiff next argues that by failing to explicitly apply the facts in the administrative record to the LOCG, United waived the right to do so in litigation.[153] United contends that it properly explained that the RTC treatment at CALO was not medically necessary and the evidence in the administrative record supports the determination.[154]

Each of the letters denying benefits for treatment at CALO stated that the treatment was not medically necessary under the RTC LOCG.[155] The LOCG for admission to an RTC require that "the factors leading to admission cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms."[156] This element can be met if there are "[p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care."[157] This element can also be met if there is an "[a]cute impairment of behavior . . . that interferes with activities of daily living to the extent that the welfare of the member or others is endangered."

Continued treatment at an RTC facility cannot be "primarily for the purpose of providing custodial care."[158] Services are custodial when they are "provided for the primary purpose of

---

[153] Pl.'s MSJ 29–31, 34–37.
[154] Defs.' MSJ 20.
[155] R. 80, R. 3052, R. 89.
[156] R. 24.
[157] R. 24.
[158] R. 24.

meeting the personal needs of the patient or maintaining a level of function . . . as opposed to improving that function to an extent that it might allow for a more independent existence."[159] Moreover, "[t]he admission criteria [must] continue to be met."[160]

The record is reviewed for evidence of an "acute impairment of behavior" that was likely to endanger the welfare of L.M. or others, or for "psychosocial or environmental problems that [we]re likely to threaten safety or undermine engagement in a less intensive level of care."[161] Prior to admission to SUWS in December 2018, L.M. was violent at school, which requested that he withdraw.[162] He kicked his mom in the back and destroyed his brother's computer.[163] Even after he received inpatient treatment, he hit his mom in the jaw "within two weeks of hospitalization."[164] With other treatments not working, L.M. was enrolled in a program at an "outpatient behavioral hospital," but the treatment did not help improve his condition.[165] His mother stated that L.M.'s insurer denied coverage for the last ten days of the program because he was not participating.[166] The director of the program recommended wilderness therapy after L.M. resisted participating in the program and failed to improve.[167]

With this important context, clinical reports at SUWS show that while L.M. was sometimes well-behaved, he still exhibited concerning behaviors. L.M.'s discharge report states that that L.M. "was increasingly able to contain himself and re-direct into more appropriate

---

[159] R. 24.
[160] R. 16.
[161] R. 24.
[162] R. 1702.
[163] R. 700.
[164] R. 1702.
[165] R. 701, 1707.
[166] R. 1707.
[167] R. 701.

regulation tactics when activated."[168] However, roughly one month before moving to CALO, L.M. "intentionally waited for an opportunity to hit a specific staff [member]"[169] as retaliation for being put in a physical restraint.[170] Moreover, a few weeks before admission to CALO, L.M. hit his head against a van window and broke the glass, which cut him deep enough to require stitches.[171]

In the context of L.M.'s ineffective treatment for his serious behavioral changes just months prior, the record favors a finding that L.M. could not have been effectively or safely treated at a lower level of care. L.M.'s behavior at the end of his treatment at SUWS indicate that his admitting symptoms had not adequately subsided, and his ineffective experiences in less intensive settings indicate that less intensive programs would have not been "safe[], efficient[], or effective[]."[172]

This finding is confirmed by two of his treating professionals' recommendations. Dr. Mary Crowson's January 16, 2019 Comprehensive Neuropsychological Evaluation, which was completed while L.M was at SUWS, recommended that L.M. receive treatment in a "structured and predictable environment"[173] that provided a "comprehensive approach to intervention."[174] Dr. Crowson diagnosed L.M. with ADHD, an adjustment disorder, parent-child relational issues, and dyslexia.[175] She recommended that treatment needed to involve a "nurturing and structured

---

[168] R. 356.
[169] R. 1901.
[170] R. 998.
[171] R. 1722.
[172] R. 24.
[173] R. 716.
[174] R. 717.
[175] R. 716.

academic setting with therapeutic support, such as a specialized boarding school" which provides "medical, educational, behavioral, and psychological interventions."[176] Further, the program should be directed "toward adolescents diagnosed with neurodevelopmental disorders such as ADHD." She also found that "traditional outpatient psychotherapy will be challenging for [L.M.]."[177]

Next, Ms. Erica Theissen, L.M.'s licensed professional counselor at SUWS, also recommended RTC treatment. In her April 26, 2019 discharge summary report, she recommended that L.M. attend a "therapeutic boarding school" to work on "emotional regulation (especially frustration tolerance and anger management), . . . communication skills, accepting and following rules both at home [and] at school, developing confidence, . . . and accepting responsibility for his actions." [178] The record evidence favors a finding that a recommendation for a therapeutic boarding school is synonymous with an RTC program in this context, and no party argues otherwise. United's April 20, 2020 denial letter states that L.M. "was sent to this therapeutic boarding school [(referring to CALO)] to work on long term issues."[179] A later April 24, 2020 United benefits decision refers to L.M.'s treatment at CALO as "Residential" and the reviewer applied the RTC LOCG to L.M.'s claim.[180]

The evidence supports a finding that CALO provided what his treating professionals recommended, and L.M. met the LOCG RTC admission criteria. L.M.'s treatment involved a

---

[176] R. 717.
[177] R. 712.
[178] R. 357.
[179] R. 80.
[180] R. 3071.

highly structured, therapeutic environment with academic and educational support.[181] And the court finds these two treater recommendations persuasive: they are sufficiently thorough, well-reasoned, and consistent with the record evidence. The question remains whether the entirety of L.M.'s stay was medically necessary.

The LOCG for Continued Service provide that "the admission criteria continue to be met and active treatment is being provided."[182] Further, to be medically necessary, care cannot be "custodial," meaning "for the primary purpose of meeting the personal needs of the patient or maintaining a level of function . . . , as opposed to improving that function to an extent that might allow for a more independent existence."[183] Treatment appears to have been effective: he participated in the program and his behavior improved, though it took some time.[184] Further, the primary purpose of L.M.'s treatment was not directed at meeting his personal needs or merely maintaining his level of function: CALO's primary goal was to provide L.M. and his parents with the tools necessary to manage his emotions and behavior at home.[185]

Within the first two weeks of being admitted. L.M. "punched [his peer] in the face" after being provoked.[186] Turning to other incidents not directly involving violent behavior, one report noted that L.M. "knock[ed] over furniture,"[187] but this refers to an incident where L.M. "knocked over multiple safety traffic cones while on the walk to the gas station."[188] Case notes frequently

---

[181] *See* R. 1708–1521.
[182] R. 16.
[183] R. 24.
[184] R. 1250–1251.
[185] *See, e.g.,* R. 1250 (Treatment Plan).
[186] R. 1649.
[187] R. 1628.
[188] R. 1629.

documented incidents of L.M. "posturing," but the record is not clear about what that entailed.
Similarly, there are frequent references to "teasing, mocking, bullying."

L.M.'s behavior worsened in July after staff informed L.M. that he would be transitioning
to an older group.[189] L.M. threw a basketball at a peer, "bloodying his mouth" on July 6, 2019.[190]
On July 21, 2019, L.M. shoved a peer "back into his chair and punched him in the stomach" after
a disagreement over a movie.[191] This increase in physical aggression after a relatively minor
adjustment at CALO favors a finding that "the factors leading to admission" had not been
sufficiently resolved as of July 21, 2019.  In the context of his ineffective treatment prior to
CALO and SUWS and his prolonged history of abuse at home, this level of treatment most
adequately addressed his "psychosocial and environmental problems." He was admitted with
serious, violent behavioral issues likely stemming from or exacerbated by abuse. Even within his
highly regulated environment, he still sometimes attacked others. While he was improving, his
behavioral problems were not adequately resolved by the end of July 2019 such that a lower
level of care was indicated.

Overall, L.M.'s physical aggression appears to have improved after transitioning to the
older group in late August 2022.[192] However, his improvement was not immediate or without
setbacks. On September 11, 2019, L.M. punched a peer "in the stomach [and then] shove[d] him
into the sink . . . L.M. quickly walked away and acted as if he had done nothing."[193] His attempt

---

[189] R. 1252.
[190] R. 1349.
[191] R. 1285.
[192] R. 1145, 1077.
[193] R. 1042.

to conceal the incident heightens the concern that a lower level of care would have not safely or effectively addressed his behavior.

Nevertheless, the evidence from after September 11, 2019 overall weighs against a finding that RTC care was medically necessary. There are no violent incidents or other serious concerns in the next few weeks. On September 27, 2019, CALO's report states L.M. "is doing well in the teen program" and "often seeks to be a quiet leader and encourage the boys to be attentive in group sessions."[194] L.M. had a successful visit home on October 24, 2019, which "went really well"—L.M. was able to transition to each parent's house and follow boundaries and house rules.[195] To be sure, L.M.'s post-September 11, 2019 behavior was not flawless. In early November, L.M. "misunderstood playfulness with aggression and punched [a] peer."[196] However, "[t]hey repaired right after and the situation was over."[197] In context of the record, this incident is consistent with the progress L.M. had made in more quickly resolving conflict and does not undermine the totality of the evidence that L.M. could have been treated at a lower level of care several weeks early in late September.

The court finds that by September 27, 2019, L.M. appeared ready for a lower level of care. Indeed, a purpose of less intensive care at a PHP or IOP facility is to assist patients receiving inpatient or RTC treatment transition back into the community.[198] In short, the preponderance of the record evidence indicates that care at CALO was medically necessary from April 15, 2019 until September 27, 2019, but not thereafter.

---

[194] R. 949–950.
[195] R. 896.
[196] R. 806.
[197] *Id*.
[198] R. 20, 23.

This finding is bolstered by L.M.'s parents' desire to pull L.M. out of the program, which was first discussed in late September 2019.[199] They were advised that doing so "goes against therapist recommendations."[200] On October 2, 2019, L.M.'s parents had another discussion with L.M.'s therapist about taking him home in November or December.[201] The therapist voiced concerns regarding "school, trauma work, [and] home visits."[202] The therapist did not record any concerns about safety or the efficacy of treatment at a lower level of care. This indicates that L.M. was likely ready to transition to a lower level of care. Additionally, the lead reason provided, "school," is not sufficient to justify RTC under the terms of the plan. "Trauma work" may or may not require RTC depending on the facts that surround it. Here, the record does not support continued RTC to support that work. Finally, the successful home visits evidenced in the record around this time supports the step down in treatment level.

Plaintiffs ask the court to focus on certain letters from L.M.'s treating professionals, which they submitted to United in late October 2019. The letters are reviewed to consider whether benefits should be awarded for the period after September 27, 2019.

On October 31, 2019, Ms. Erica Theissen, the clinical director of SUWS, recommended that L.M. continue treatment in an RTC facility because she believed it "necessary to achieve significant and lasting improvement of [L.M.'s] struggles."[203] Plaintiffs point to no record evidence that Ms. Thiessen had seen or treated L.M. since he was discharged from SUWS more than six months earlier.

---

[199] R. 989.
[200] R. 989.
[201] R. 969.
[202] R. 969.
[203] R. 691.

A few days after Ms. Theissen's October 31, 2019 letter, Dr. Alain Katic, who had treated L.M. prior to his admission to SUWS, starting in 2013, opined that L.M. "was always at risk of losing his temper and escalating to the point of possible self-injurious behavior or threatening injury to others."[204] Dr. Katic also reported that L.M had "persistently unstable mental health" and recommended that he transition to an RTC facility like CALO.[205] Again, no evidence is presented that Dr. Katic was still providing active treatment of L.M. in and around the time L.M. was admitted to CALO or during his stay there.

Around the same time, Ms. Kathy Abeln, the clinical director of the CALO program, recommended that L.M. stay at CALO because otherwise "the likelihood that [L.M.'s] behaviors will increase is high and his emotional well[-]being will decrease."[206] Among other things, Ms. Abeln's letter states that the "behaviors we typically see from [L.M.] are antagonizing peers, refusing or defiance of activities, verbal aggression, arguing with staff, displaying anger when he doesn't get his way or what he wants, and emotional dysregulation."[207] The letter does not indicate that it is addressing a particular time period during L.M.'s stay at CALO, and the behaviors referenced do not paint the more complete picture presented by the records themselves.

These letters confirm that at least some of L.M.'s treating professionals thought at some point that RTC treatment would be beneficial. However, the three letters were sent in October and November—shortly before L.M. was discharged from CALO—and appear to have been

---

[204] R. 693.
[205] R. 693.
[206] R. 696.
[207] R. 695.

generated within a few days of each other to support L.M.'s appeal from United's benefits denial. On this de novo review, the court finds the earlier recommendations that preceded L.M.'s time at CALO to be better evidence than the much later ones. And two of three letters are not sharing contemporaneous observations, but rather are based on much earlier interactions with L.M. This does not make them irrelevant, but on this record it makes them less helpful.

Additionally, none of the letters sent in late 2019 explain how L.M. would have been unable to be treated safely and effectively in a lower level of care, including a partial hospitalization program. Put differently, the question is not whether RTC treatment would be more convenient, preferable, or effective, but rather whether safe and effective treatment could occur at a lower level of care. The letters also do not explain how the primary purpose of treatment at this level is non-custodial. To the contrary, there is evidence that the primary purpose after September was custodial in nature. For example, Ms. Abeln states that "[i]f [L.M.] is not in an environment that will help him feel safe in his trauma and work from the bottom up in his brain, the most likely outcome is that [he] will work the system and become worse."[208] Helping L.M. feel safe and preventing him from becoming worse is a custodial justification for treatment under the LOCG's definition: "meeting the personal needs of the patient or maintaining a level of function."[209] L.M.'s treating professionals' letters do not provide sufficient evidence to warrant Plan benefits at the RTC level after September 27, 2019.

Plaintiff also contends that because plan administrators may not articulate arguments not presented in the prelitigation administrative record and because many of United's denial letters

---

[208] R. 696.
[209] R. 24.

do not provide much analysis, United is barred from making essentially any argument to support its medical necessity determination in litigation.[210] The rule that plan administrators may not raise arguments not in the prelitigation record originates from ERISA's "full and fair review" requirements articulated in ERISA's implementing regulations.[211] In the context of the arbitrary and capricious standard of review, the failure to provide a "full and fair review" is to remand the benefits determination to the administrator unless the record clearly favors entitlement to benefits.[212] Even assuming United failed to provide a "full and fair review,"[213] neither ERISA's implementing regulations nor binding precedent state that the court is required to simply order benefits, no matter the record evidence, when a court is reviewing a benefits decision de novo.[214] Instead, the court is required to determine whether "plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review [of the administrator's decision]."[215]

In short, the evidence in the administrative record does not demonstrate that L.M.'s treatment at CALO after September 27, 2019 was medically necessary under the LOCG. That

---

[210] Pl.'s MSJ 34–36.

[211] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1298 (10th Cir. 2023) (citing 29 C.F.R. § 2560.503-1(g)(1))).

[212] *See David P.*, 77 F.4th at 1315.

[213] *David P.*, 77 F.4th at 1288 (citing 29 C.F.R. § 2560.503-1(g)(1))).

[214] In an unpublished decision, the Tenth Circuit held that "A showing that the administrator failed to follow ERISA procedures . . . provides a basis for reversal separate from that provided by de novo review of the merits of the claim." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 833 (10th Cir. 2008). The decision cites to a Seventh Circuit opinion which held that when a claimant proves that he would have received benefits "but for the plan administrator's arbitrary and capricious conduct," retroactive reinstatement of benefits is warranted. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 777 (7th Cir. 2003). Plaintiffs do not argue that but for any procedural irregularities, L.M. would have been entitled to Plan benefits. Even if the decision were binding, it would not apply here.

[215] *Niles*, 269 F. App'x. at 833. It is noted, however, that many of United's letters in the record are inadequate. For example, United's initial benefits decision for L.M.'s CALO treatment on September 17, 2019 is completely devoid of analysis and instead offers a single conclusion: that care could have occurred in a PHP setting. R. 634. A full and fair review requires more than this.

time at CALO was primarily custodial in nature. The preponderance of the evidence show L.M. could have been treated safely and effectively at a lower level of care. Accordingly, Plaintiff is not entitled to reimbursement under the Plan for that time period.

## II.   MHPAEA Claim

MHPAEA amended ERISA "'to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans.'"[216] Under the Act, covered plans must ensure that: (1) "treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage)"; and (2) "there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."[217]

A "'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."[218] Implementing regulations explain that the statute covers both "quantitative treatment limitations" ("QTLs") and "nonquantitative treatment limitations" ("NQTLs").[219] QTLs "are expressed numerically (such as 50 outpatient visits per year)." NQTLs, as the name suggests, are nonquantitative and "any processes, strategies, evidentiary standards, or other factors used in applying . . . [NQTLs] to mental health or substance use disorder benefits" must be "comparable to, and . . . applied no

---

[216] *E.W.  v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1281 (10th Cir. 2023) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 36 (2d Cir. 2016)).
[217] 29 U.S.C. § 1185a(a)(3)(A).
[218] § 1185a(a)(3)(B)(iii).
[219] 29 C.F.R. § 2590.712(a).

more stringently than, the [same factors] . . . used in applying the limitation with respect to medical/surgical benefits."[220]

The Tenth Circuit has not defined the elements of a MHPAEA claim.[221] However, the parties agree on a four-part test that has been applied by district courts.[222] The factors are: (1) the Plan is subject to MHPAEA; (2) the Plan "provides benefits for both mental health/substance abuse and medical/surgical disorder benefits;" (3) the plan administrator places "differing limitations on benefits for mental health care" as compared to analogous "medical/surgical care;" and (4) 'the differing limitations on mental health care are more restrictive than the predominant limitations based on the medical/surgical analogues."[223] The parties agree that the first two elements are not in dispute.[224]

This test may be used to challenge treatment limitations "either facially or as applied."[225] Plaintiff asserts only an "as applied" claim,[226] which occurs when facially neutral terms are applied disparately.[227] Plaintiff argues that United utilized "acute criteria" to determine the medical necessity of L.M.'s sub-acute mental health care, when acute criteria are not required for analogous medical/surgical care.[228] By effectively requiring, among other things, that L.M. display suicidal or homicidal behavior, bizarre beliefs, or hallucinations, Plaintiff argues that

---

[220] § 2590.712(c)(4)(i).
[221] *E.W.*, 86 F.4th at 1282 ("Neither our Circuit nor any others have defined the elements of a MHPAEA claim.").
[222] Plaintiff describes the elements of the claim on page 37 of their Motion for Summary Judgment and Defendants do not oppose Plaintiff's language in their responsive briefing. *See generally* Defs.' Resp.
[223] *See K.K. v. United Behavioral Health*, No. 2:17-cv-01328, 2020 WL 262980, at *3 (D. Utah January 17, 2020) (unpublished); *Robert B. v. Premera Blue Cross*, 2023 WL 7282762, at *20 (D. Utah November 3, 2023); *E.W.*, 86 F.4th at 1282 (listing similar elements as applied to a motion to dismiss).
[224] *See* Pl.'s MSJ 37; Defs.' Resp. 43–52.
[225] *E.W.*, 86 F.4th at 1284.
[226] Pl.'s MSJ 38.
[227] *E.W.*, 86 F.4th at 1284.
[228] Pl.'s MSJ 38.

United impermissibly imposed a more stringent NQTL than what is required for an analogous medical treatment.[229]

Plaintiff provides scant analysis for the MHPHAEA claim. While noting that there may be multiple medical/surgical analogues for RTC, Plaintiff makes only a cursory argument involving care provided in a skilled nursing facility ("SNF").[230] United uses the Milliman Care Guidelines ("MCG") for said care.[231] Plaintiff identifies the MCG criteria for admission into a SNF for Angina or Chest Pain as a comparator. Under the MCG, admission is medically necessary when ████████████████████████████ and ██████████████████████ ████████████████████████████████████████████████████ ████████████████[232]

However, Plaintiff has failed to offer any evidence that United has applied the RTC LOCG any more stringently than United has applied the SNF MCG. The only evidence offered is the application of the LOCG to L.M.'s treatment at an RTC facility and the assertion that the MCG do not require acute symptoms.[233] This is insufficient. Without evidence of United applying the MCG less stringently, Plaintiff cannot prevail on an as-applied MHPAEA claim. At the summary judgment stage, the question is no longer plausibility, but preponderance of the evidence.

---

[229] Pl.'s MSJ 39.
[230] *E.W.*, 86 F.4th at 1289 ([C]are in an inpatient skilled nursing facility is analogous to care in a residential treatment center—which also provides inpatient care—for purposes of MHPAEA's parity requirement.").
[231] Pls.' Statement of Facts ¶ 57.
[232] R. 3981.
[233] Pl.'s MSJ 39.

Plaintiff's argument presupposes that United's application of the LOCG is necessarily more restrictive than any possible application of the MCG. However, the allegedly offending MCG requires that a ███████████████████████████[234] Whether a need is ███████████████████ is open for interpretation. Thus, this Guideline could be applied just as restrictively as United's application of the LOCG to L.M.'s claim. Without evidence of disparate application of the Guidelines, Plaintiff has not met his burden of establishing his as-applied MPHAEA claim.

Moreover, the denial letter in question references the absence of homicidal behavior, bizarre beliefs, and hallucinations, but also addresses various other relevant aspects of L.M.'s condition including mood stability, coping skills, self-care, absence of active medical problems, and family work and support. These conditions, taken together, formed the basis of the finding that 24-hour residential care was not needed at that time and that care could have continued in a less restrictive setting, like a partial hospitalization program. Plaintiff does not adequately explain how the letter's references of the lack of "acute behavioral challenges" show that United applies its MCG less stringently than it applies its LOCG.

For all these reasons, the MPHAEA claim fails on this record.

## ORDER

Accordingly, the court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Summary Judgment[235] and GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.[236]

---

[234] R. 3981.
[235] ECF No. 32.
[236] ECF No. 28.

1. For Count I, the court GRANTS IN PART Plaintiff's motion and GRANTS IN PART Defendants' motion. For Plaintiff's claim regarding Plan benefits for SUWS treatment, the court finds that L.M. is eligible for benefits for his care at SUWS. The court REMANDS the claim to determine the proper reimbursement amount consistent with this order. The court further GRANTS IN PART Defendant's motion as to L.M.'s treatment at CALO and REMANDS that claim to determine the proper reimbursement amount consistent with this order.

2. For Count II, summary judgment is GRANTED for Defendants and DENIED for Plaintiffs as to Plaintiff's MHPAEA Claim.

Signed July 26, 2024.

BY THE COURT

_____

David Barlow
United States District Judge

37